# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

CAMERON JEREL HENDRICK,    )
           )
    Petitioner,    )
           )
v.           )    **Case No. 18-CV-0596-TCK-JFJ**
           )
RICK WHITTEN,[1]    )
           )
    Respondent.    )

## OPINION AND ORDER

Petitioner Cameron Hendrick, a state inmate appearing *pro se*,[2] brings this federal habeas action, under 28 U.S.C. § 2254, to challenge his custody under the criminal judgment and sentence entered against him in the District Court of Tulsa County, Case No. CF-2015-948, after a jury convicted him of first-degree murder and possessing a firearm after former conviction of a felony. He claims his custody is unlawful because prosecutorial misconduct deprived him of his right to a fair trial, errors by trial counsel and appellate counsel deprived him of his right to the effective assistance of counsel, the trial court's acceptance of a victim-impact statement at sentencing violated state law, and the evidence presented at trial was not sufficient to establish his guilt beyond a reasonable doubt. Having considered Hendrick's petition for writ of habeas corpus (Dkt. 1) and supporting briefs (Dkts. 1-1, 1-2, 1-3), Respondent Rick Whitten's response in opposition to the

---

[1] Because Hendrick is incarcerated at the North Fork Correctional Center (NFCC), the proper respondent is Rick Whitten, the NFCC's warden. *Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004); Rule 2(a), *Rules Governing Section 2254 Cases in the United States District Courts*. The Court therefore substitutes Rick Whitten in place of the State of Oklahoma as party respondent. The Clerk of Court shall note this substitution on the record.

[2] The Court liberally construes the pleadings Hendrick filed as a *pro se* litigant, both in this proceeding and in state postconviction proceedings. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

petition (Dkt. 10), Hendrick's reply brief (Dkt. 13), and the record of state-court proceedings (Dkts.

10, 11, 12), the Court finds that no evidentiary hearing is necessary to resolve Hendrick's claims,

denies his request for an evidentiary hearing, and denies the petition.

## BACKGROUND

The following factual summary from the decision of the Oklahoma Court of Criminal

Appeals (OCCA) affirming Hendrick's judgment and sentence adequately describes the facts that

resulted in his convictions.  The Court therefore adopts that factual summary as its own.[3]

In February of [2015] Brittish Ratliff lived in an apartment in Tulsa with her son, B.S.  Before Valentine's Day in [2015], Ratliff had been dating Cameron Hendrick on and off for two years.  On Valentine's Day, however, Ratliff and Hendrick broke up.  The following day, on February 15, [2015], Robert Singleton, B.S.'s father, stayed the night at Ratliff's apartment with her and B.S.  Ratliff's cousin, fourteen year old B.G., and Hendrick's younger brother, thirteen year old P.H., stayed the night in the apartment as well.

Ratliff woke up between 8:00 and 8:30 the following morning.  She noticed that she had messages from Hendrick on Facebook.  Ratliff responded to Hendrick telling him that Singleton had spent the night.  Hendrick became angry and the two exchanged heated, insulting Facebook messages for about thirty minutes.  During this exchange, Hendrick messaged Ratliff two pictures of guns and made reference to "big thangs [sic] popping."  He messaged her, "see me down stairs better lock yo [sic] door."  Ratliff tired of arguing and told Hendrick to come pick up his younger brother.

At about 10:30 that morning, when Ratliff was walking outside between her apartment and her neighbor's apartment, she saw that Hendrick had arrived.  She yelled at P.H. to get his stuff together and she watched as Hendrick walked up the stairs toward her apartment.  When he saw Ratliff, Hendrick stopped on the landing and started arguing with her as she stood at the top of the stairs.  Singleton heard the two arguing, stepped outside, and joined the fray.  Hendrick said, "I got something for you" and he walked back down the stairs to his car.  When Hendrick returned he had a gun in his hand.  He waved at Singleton to get away from the apartment and Singleton walked down the stairs.  When Singleton got to the bottom of the stairs Ratliff ran down to him and grabbed him.  As Singleton pushed Ratliff to the side, she heard Hendrick shoot the gun five times.  Singleton was hit with three bullets.  He fell to the ground and died within moments from multiple gunshot

---

[3] The OCCA's opinion mistakenly identified the year of the murder as 2014, so the factual summary has been corrected to reflect the year as 2015.

wounds.  Hendrick left the scene but was apprehended by the police several hours later.

Dkt. 10-4, *State v. Hendrick*, No. F-2016-295 (Okla. Crim. App. Aug. 10, 2017) (unpublished) (OCCA Op.), 2-3.

Based on the foregoing events, the State of Oklahoma charged Hendrick with first-degree murder, in violation of Okla. Stat. tit. 21, § 701.7, and possession of a firearm after former conviction of a felony, in violation of Okla. Stat. tit. 21, § 1283.  Dkt. 11-9, Original Record (O.R.) vol. 1, 18 [13].[4]  To support the charge of unlawfully possessing a firearm, the State alleged Hendrick had one prior felony conviction from 2007. Dkt. 11-9, O.R. vol. 1, 18 [13].  For purposes of sentencing, the State further alleged Hendrick had been convicted of eight additional felonies between 2007 and 2011.  Dkt. 11-9, O.R., vol. 1, 21-22 [16-17].  Hendrick's case proceeded to a jury trial in March 2016.

During the State's case-in-chief, Ratliff and B.G. testified about the events that occurred on the morning of the shooting, and both identified Hendrick as the person who shot Singleton. Dkt. 11-5, Tr. Trial vol. 2, 39-65 [279-305], 120-48 [360-88].  Ratliff testified that Singleton was the father of her son, that she had known Singleton and Hendrick for more than 10 years, that she began dating Hendrick in 2013, and that she and Hendrick broke up on February 14, 2015—two days before the shooting.  Dkt. 11-5, Tr. Trial vol. 2, 39-41 [272-81].  Ratliff testified that Singleton, who was married but contemplating divorce, spent the night at her apartment on February 15, 2015.  Dkt. 11-5, Tr. Trial vol. 2, 42-43 [282-83].  She described Singleton as a "really good father" and testified that their son, B.S., Ratliff's cousin, B.G., and Hendrick's

---

[4] For consistency, the Court's citations generally refer to the CM/ECF header pagination. However, when citing to the original record and transcripts of state court proceedings, the Court provides the original page numbers, in brackets, to the extent they differ from the CM/ECF header pagination.

younger brother, P.H., also stayed at her apartment on the night before the shooting.  Dkt. 11-5, Tr. Trial vol. 2, 42-43 [282-83], 71 [311].  Ratliff testified that she woke up around 8:30 a.m. on February 16, 2015, that she and Hendrick communicated through Facebook messages and over the phone, and that she told Hendrick that Singleton spent the night so that Hendrick would not just "show up" at her apartment "randomly."  Dkt. 11-5, Tr. Trial vol. 2, 45-50 [285-90], 72-73 [312-13].  Ratliff admitted on cross-examination that she knew Singleton and Hendrick hated each other, that they were jealous of each other, that they both had tempers, and that she also told Hendrick that she planned to let Singleton move in with her.  Dkt. 11-5, Tr. Trial vol. 2, 73-75 [313-15], 89-90 [329-30].  Images of the Facebook messages exchanged between Hendrick and Ratliff were admitted at trial without objection. Dkt. 11-5, Tr. Trial vol. 2, 50 [490]; *see also* Dkt. 12, Court's Ex. 3 (compact disc containing State's Exhibits 1-48, with no Exhibit 43).

According to Ratliff, Hendrick "lost it" after she mentioned that Singleton spent the night, Hendrick began calling her obscene names, Hendrick sent messages showing photographs of guns, and Hendrick warned her to "lock" her door.  Dkt. 11-5, Tr. Trial vol. 2, 45-50 [285-90].  Ratliff testified that she eventually had "enough" of the conversation and that she told Hendrick to come to the apartment to pick up his brother, P.H., and, in addition, to bring her some marijuana.  Dkt. 11-5, Tr. Trial vol. 2, 53 [293], 87 [327].  Ratliff saw Hendrick arrive at her apartment complex around 10:30 a.m. and told P.H. to gather his things because Hendrick was there to take him home. Dkt. 11-5, Tr. Trial vol. 2, 54-55 [294-95].  Ratliff was standing outside the door of her second-floor apartment when she saw Hendrick start walking up the stairs.  Dkt. 11-5, Tr. Trial vol. 2, 55-58 [295-98].  Ratliff testified that when Hendrick saw her, he stopped, began yelling obscenities at her, and had his hands in the front pocket of his hoodie "like he had something in his pocket." Dkt. 11-5, Tr. Trial vol. 2, 58-59 [298-99].  According to Ratliff, Singleton heard the commotion,

came outside, stood next to Ratliff and stated something "like, what the fuck you doing here, cuz, you going to do something, cuz, or what, you going to do something or what." Dkt. 11-5, Tr. Trial vol. 2, 59-60 [299-300] (verbatim from Ratliff's testimony).   Ratliff testified that Hendrick responded by saying, "I got something for you," and walked down the stairs toward his car.  Dkt. 11-5, Tr. Trial vol. 2, 60 [300].  Ratliff told Singleton to go back inside and told P.H. to "go get your brother."  Dkt. 11-5, Tr. Trial vol. 2, 60-61 [300-01], 94 [334].  P.H. walked down the stairs toward Hendrick's car, but Singleton did not go inside the apartment.  Dkt. 11-5, Tr. Trial vol. 2, 60-61 [300-01].  Ratliff testified that Hendrick came back with a gun in his hand, waved the gun, and told Singleton to move away from the apartment.  Dkt. 11-5, Tr. Trial vol. 2, 61-62 [301-02]. Singleton walked to the bottom of the stairs, Ratliff either walked down with him or ran down to join him at the bottom of the stairs, and she saw Singleton tighten his belt as if he were preparing to fight with Hendrick.  Dkt. 11-5, Tr. Trial vol. 2, 62-63 [303-03], 998 [338].  Ratliff testified that she was "holding" Singleton at that point, that he "pushed [her] to the side of him," that she heard five gunshots, and that Singleton fell.  Dkt. 11-5, Tr. Trial vol. 2, 63 [303].  Ratliff tried to care for Singleton by putting pressure on his gunshot wound, urged people to call 911, and did not see Hendrick leave.  Dkt. 11-5, Tr. Trial vol. 2, 63-64 [603-04].

When law enforcement officers arrived, they escorted Ratliff to a police car.  Dkt. 11-5, Tr. Trial vol. 2, 64 [304].  Ratliff told the officers that Hendrick shot Singleton, described his car as a black-and-white highway patrol car, and told the officers he might have driven to his mother's apartment near 71st and Memorial.  Dkt. 11-5, Tr. Trial vol. 2, 64-65 [304-05], 67-70 [307-10]. Ratliff testified on cross-examination that she had described Singleton as a good father but admitted that she filed a protective order against him in 2007.  Dkt. 11-5, Tr. Trial vol. 2, 87 [327].

B.G., who was 16 years old at the time of trial, testified that he knew Hendrick because his

cousin, Ratliff, dated Hendrick for a period of time.  Dkt. 11-5, Tr. Trial vol. 2, 120-21 [360-61].

B.G. knew Singleton as the father of Ratliff's son, B.S., and described B.S. as his younger cousin.

Dkt. 11-5, Tr. Trial vol. 2, 122 [362].  According to B.G., Hendrick "was supposed to come over

to pick up [P.H.], and then that's where all the argument started to happen."  Dkt. 11-5, Tr. Trial

vol. 2, 124 [364].  B.G. testified that he was sitting on the couch when Hendrick arrived, that he

saw Hendrick in the doorway of Ratliff's apartment, that he thought Hendrick used a key to open

the door, that Ratliff and Hendrick began arguing, that Singleton joined in, and that the argument

"moved outside in some way."  Dkt. 11-5, Tr. Trial vol. 2, 125-26 [365-66], 143-44 [383-84].  At

some point, B.G. went outside and stood on the balcony or the landing of the stairs.  Dkt. 11-5, Tr.

Trial vol. 2, 128-29 [368-69].  He saw Ratliff and Singleton near the bottom of the stairs, he saw

Hendrick leave, and he assumed Hendrick went to his car because he "heard his [car] door shut."

Dkt. 11-5, Tr. Trial vol. 2, 127-28 [367-68].  B.G. testified he then saw Hendrick return with a gun

in his hand, saw Ratliff and Singleton standing together "basically clinging on to each other," saw

Hendrick pointing the gun at Ratliff and Singleton, saw Singleton push Ratliff out of the way, saw

Hendrick shoot Singleton, and saw Singleton fall to the ground.  Dkt. 11-5, Tr. Trial vol. 2, 128-

31 [368-71], 146 [386].  B.G. testified that he asked a neighbor to call 911 but eventually made

the call himself and that he moved B.S. away from the front door of the apartment.  Dkt. 11-5, Tr.

Trial vol. 2, 132 [372].  B.G. testified that he spoke with law enforcement officers about five to

ten minutes after the shooting, that he told the officers, and later told a detective at the police

station, that he had seen Hendrick shoot Singleton.  Dkt. 11-5, Tr. Trial vol. 2, 133-36 [373-76],

147-48 [387-88].  He further testified that it was possible he might have told an officer he only

heard the shooting "because [he] wasn't in [his] calmest moods" when he spoke to officers

immediately after the shooting.  Dkt. 11-5, Tr. Trial vol. 2, 133-36 [373-76], 147-48 [387-88].

B.G. testified that he did not speak with Ratliff before he spoke with law enforcement officers or before he was interviewed by a detective. Dkt. 11-5, Tr. Trial vol. 2, 134 [374].

P.H., who was 14 years old at the time of trial, also testified as a State witness. Dkt. 11-5, Tr. Trial vol. 2, 182-83 [422-23]. P.H. testified that he sometimes visited Ratliff because she was Hendrick's girlfriend and because he was friends with B.S. and B.G. Dkt. 11-5, Tr. Trial vol. 2, 184 [424]. P.H. testified that Hendrick came over to pick him up from Ratliff's apartment on the morning of the shooting, that Hendrick never entered the courtyard of the apartment, that Hendrick got out of the car to exchange hoodies with Ratliff, that he heard several "bangs" after Hendrick got back into the car, and that Hendrick drove P.H. home. Dkt. 11-5, Tr. Trial vol. 2, 182-91 [422-31]. The prosecutor then asked P.H. if he had provided that same information to Detective Ritter after the shooting, and P.H. said that he had. Dkt. 11-5, Tr. Trial vol. 2, 191 [431].

During a brief bench conference, outside the hearing of the jury, the prosecutor and trial counsel agreed that P.H.'s trial testimony differed significantly from statements he made to Detective Ritter on the day of the shooting, and the trial court granted the prosecutor's request to impeach P.H.'s testimony. Dkt. 11-5, Tr. Trial vol. 2, 191-92 [431-32]. The prosecutor then played for the jury the videotape of Ritter's interview with P.H. Dkt. 11-5, Tr. Trial vol. 2, 193-98 [433-38].[5] During the interview, P.H. stated that he spent the night at Ratliff's apartment and that he got into Hendrick's car when Hendrick came to the apartment to pick him up. Dkt. 12, Court's Ex. 1, 13:01:00-13:01:19. According to P.H., Hendrick got out of the car, Hendrick came back to the car and left again, P.H. heard a "bang," Hendrick got back into the car, and Hendrick

---

[5] The videotaped interview, Court's Exhibit 1, was played to the jury with some redactions, and, referring to the internal time stamp on the video, the State clarified that the interview was played from the beginning, stopped at 13:06:18, resumed at 13:08:29, and stopped completely at 13:11:05. Dkt. 11-6, Tr. Trial vol. 3, 4-5 [447-48].

drove away quickly.  Dkt. 12, Court's Ex. 1, 13:01:19-13:01:31, 13:05:54-13:06:18, 13:08:29-

13:11:05.  P.H. stated that Hendrick drove to the apartment where P.H. lived with Hendrick and

his mother, and P.H. described how he was arrested after Hendrick dropped him off and drove

away from the apartment.  Dkt. 12, Court's Ex. 1, 13:01:31-13:01:53.  P.H. then asked if he could

talk to Ratliff, explained to Ritter that it was sad that Ratliff's "baby daddy died," that he was

friends with Ratliff's son, and that he did not want his "stupid brother" "messing anything up"

between P.H. and Ratliff.  Dkt. 12, Court's Ex. 1, 13:02:09-13:02:53.  P.H. later stated that

Cameron "didn't need to do that" and that "it was really unnecessary to shoot somebody."  Dkt.

12, Court's Ex. 1, 13:08:29-13:08:50.[6]  P.H. stated that he saw a can of mace in Hendrick's car,

that he did not see the shooting or "any guns," and that Hendrick appeared to be holding something

inside his jacket and under his arm when Hendrick returned to the car after P.H. heard a gunshot.

Dkt. 12, Court's Ex. 1, 13:08:50-13:10:39.  After the videotaped interview was published to the

jury, P.H. testified that he told the truth during his interview and when he testified at trial.  Dkt.

11-5, Tr. Trial vol. 2, 198-99 [438-39].  On cross-examination, P.H. testified that he heard "four

or five bangs" after Hendrick got back into the car.  Dkt. 11-5, Tr. Trial vol. 2, 200 [440].

Officer Albert Caballero, a patrol officer with the Tulsa Police Department, testified that

he was the second officer who responded to the scene of the shooting and that, upon his arrival, it

was apparent to him that Singleton had died.  Dkt. 11-6, Tr. Trial vol. 3, 6 [449], 10-14 [453-57].

---

[6] To provide some context for P.H.'s statements, the Court notes that, during the portion of
the interview that was not published to the jury and that immediately preceded these statements,
P.H. told Detective Ritter that he heard Hendrick and Singleton arguing about Hendrick's threats
to spray Ratliff with mace, heard both Hendrick and Singleton identify themselves as gang
members from rival gangs, saw Singleton follow Hendrick down the stairs, and assumed, after
hearing a "bang," that Hendrick shot Singleton because the two were "from different colors."  Dkt.
12, Court's Ex. 1, 13:06:18-13:08:29.  The purpose of this redaction was to avoid introducing
gang- membership evidence at trial.  Dkt. 11-5, Tr. Trial vol. 2, 193-96 [433-36].

Caballero testified that the first officer who arrived, Officer Anna Cowdrey, took Ratliff to a patrol car and tried to calm her down.  Dkt. 11-6, Tr. Trial vol. 3, 14 [457], 18 [461].   Detective Justin Ritter testified that when he arrived at Ratliff's apartment complex, he saw that Singleton was deceased and that he had one obvious gunshot wound to the chest.  Dkt. 11-6, Tr. Trial vol. 3, 45 [488], 49-51 [492-94].  Ritter spoke with Ratliff before Officer Cowdrey transported Ratliff to the police station.  Dkt. 11-6, Tr. Trial vol. 3, 51-52 [494-95].  Ritter testified that Ratliff identified Hendrick as the person who shot Singleton and provided a description of Hendrick's vehicle.  Dkt. 11-6, Tr. Trial vol. 3, 52 [495].

Based on information obtained from Ratliff, law enforcement officers located Hendrick's vehicle near the apartment complex where he lived with his mother and P.H., which was approximately six miles from Ratliff's apartment.  Dkt. 11-6, Tr. Trial vol. 3, 21-26 [464-69], 57-58 [500-01].  Officer Timothy Pike testified that he saw Hendrick's vehicle stop, saw a "younger" person get out who "vaguely fit the description of the suspect," saw Hendrick's car leave, and arrested the person who appeared to be in his mid-teens and who was later identified as P.H.  Dkt. 11-6, Tr. Trial vol. 3, 20-24 [463-67], 38 [481].  After a second officer, Officer Cindy Murphy, arrived, Pike left P.H. with Murphy, pursued Hendrick's car, saw a person walking "who fit the description to a T," and saw that person, who was later identified as Hendrick, running toward Murphy's location.  Dkt. 11-6, Tr. Trial vol. 3, 24-25 [467-68], 33-37 [476-80].  Pike radioed Murphy who then arrested Hendrick.  Dkt. 11-6, Tr. Trial vol. 3, 37-38 [480-81].  Law enforcement officers searched extensively for the gun that was used to kill Singleton, but they did not locate the murder weapon.  Dkt. 11-6, Tr. Trial vol. 3, 53-58 [496-501].

At the conclusion of the first stage of the trial, the jury found Hendrick guilty of first-degree murder.  Dkt. 11-6, Tr. Trial vol. 3, 144 [587].  During the second stage, the State presented

evidence that Hendrick had one prior felony conviction, and the jury found Hendrick guilty of possessing a firearm after former conviction of a felony.  Dkt. 11-6, Tr. Trial vol. 3, 149-55 [592-98], 167 [610].  During the third stage, the State presented evidence that Hendrick had seven prior felony convictions.  Dkt. 11-6, Tr. Trial vol. 3, 175-78 [618-21], 180-82 [623-25].  At the conclusion of the third stage, the jury recommended a sentence of life imprisonment without the possibility of parole as to the murder conviction and a sentence of 30 years' imprisonment as to the firearm conviction.  Dkt. 11-6, Tr. Trial vol. 3, 194 [637]; Dkt. 10-4, OCCA Op., 1.  The trial court sentenced Hendrick accordingly and ordered the sentences to be served consecutively.  Dkt. 10-4, OCCA Op., 1; Dkt. 11-8, Tr. Sentencing, 13.

Represented by counsel, Hendrick filed a direct appeal in the OCCA, claiming (1) that the prosecutor committed reversible misconduct during closing argument, (2) that trial counsel was ineffective for three reasons, and (3) that the trial court abused its discretion and violated state law by admitting a victim-impact statement from Ratliff at sentencing. Dkt. 10-1, Appellant Br., 1-2. In an opinion filed August 10, 2017, the OCCA rejected each claim and affirmed Hendrick's judgment and sentence.  Dkt. 10-4, OCCA Op., 3-9.

Proceeding *pro se*, Hendrick filed an application for postconviction relief and a motion for an evidentiary hearing in state district court. Dkts. 10-5, 10-6. In his application, Hendrick asserted (1) that appellate counsel was ineffective for failing to adequately argue trial counsel's ineffectiveness, (2) that trial counsel was ineffective for five reasons not presented on direct appeal, (3) that the State failed to present sufficient evidence to support his convictions, and (4) that the prosecutor committed reversible misconduct during closing argument in addition to the

misconduct alleged on direct appeal.  Dkt. 10-5, Appl., 2.[7]  On May 18, 2018, the state district court denied Hendrick's motion for an evidentiary hearing and denied his application for postconviction relief.  Dkt. 10-7, Dist. Ct. Order, 1, 9-10.  Hendrick filed a postconviction appeal and renewed his request for an evidentiary hearing.  Dkts. 10-8, 10-9.  In an order filed August 3, 2018, the OCCA denied his request for an evidentiary hearing and affirmed the denial of his application for postconviction relief.  Dkt. 10-10, *Hendrick v. State*, No. PC-2018-603 (Okla. Crim. App. Aug. 3, 2018) (unpublished) (OCCA Order), at 1-7.

Hendrick filed the instant petition for writ of habeas corpus (Dkt. 1), along with a supporting brief and exhibits (Dkts. 1-1, 1-2, 1-3), on November 19, 2018.[8]

## DISCUSSION

### I.   Legal Framework

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) limits a federal court's authority to grant federal habeas relief to state prisoners in three ways that are relevant in this case.[9]  First, a federal court may grant habeas relief to a prisoner in custody pursuant to a state-court judgment "only on the ground that [the prisoner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *see Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) ("[I]t is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts.").  Second, a federal court may grant habeas

---

[7] Because Hendrick appeared without counsel in state postconviction proceedings, the Court has liberally construed his application for postconviction relief in an attempt to discern his claims.

[8] The Court's citations refer to the multi-part supporting brief and exhibits as "Pet'r's Br."

[9] The AEDPA imposes a one-year statute of limitations for filing a federal habeas petition, and, for most state prisoners, the one-year period begins on the date their convictions became final. 28 U.S.C. § 2244(d)(1).  Whitten does not contest the timeliness of the petition. Dkt. 10, Resp., 2.

relief only if the prisoner has either (1) exhausted available state-court remedies, 28 U.S.C. § 2254(b)(1)(A), by "fairly present[ing] the substance of his federal habeas claim[s] to state courts," *Hawkins v. Mullin*, 291 F.3d 658, 668 (10th Cir. 2002), or (2) demonstrated a complete absence of available state remedies or an absence of effective state remedies, § 2254(b)(1)(B). Third, a federal court may grant habeas relief to a state prisoner on a federal claim that was adjudicated on the merits in state court only if the prisoner first demonstrates that the state court's adjudication of that claim "resulted in a decision that" either (1) "was contrary to . . . clearly established Federal law," 28 U.S.C. § 2254(d)(1), (2) "involved an unreasonable application of clearly established Federal law," *id.* § 2254(d)(1), or (3) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).[10]

The procedural-default doctrine imposes a fourth limitation.  Under that doctrine, a federal court may grant habeas relief on "federal claims that were procedurally defaulted in state court— that is, claims that the state court denied based on an adequate and independent state procedural rule,"[11] *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017),—only if the prisoner first demonstrates either "cause" for the procedural default and "actual prejudice resulting from the alleged constitutional violation," *Wainwright v. Sykes*, 433 U.S. 72, 84 (1977), or that failure to review the claim will result in a fundamental miscarriage of justice, *Coleman v. Thompson*, 501 U.S. 722, 750

---

[10] As used in § 2254(d)(1), the phrase "clearly established Federal law" means "the governing legal principle or principles" stated in "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (quoting *Terry Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

[11] A state procedural rule "is independent if it is separate and distinct from federal law" and "is adequate if it is 'strictly or regularly followed' and applied 'evenhandedly to all similar claims.'"  *Duvall v. Reynolds*, 139 F.3d 768, 796-97 (10th Cir. 1998) (quoting *Hathorn v. Lovorn*, 457 U.S. 255, 263 (1982)).

(1991).

"To establish 'cause,' . . . the prisoner must 'show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" *Davila*, 137 S. Ct. at 2065 (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). "[I]n certain circumstances counsel's ineffectiveness in failing properly to preserve [a] claim for review in state court will suffice" as "'cause' to excuse a procedural default." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). However, an ineffective-assistance-of-counsel claim "generally must 'be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default'" of another constitutional claim. *Carpenter*, 529 U.S. at 451-52 (quoting *Carrier*, 477 U.S. at 489). And the petitioner must do more than simply allege deficient performance; the petitioner must demonstrate that counsel's "assistance [was] so ineffective as to violate the Federal Constitution." *Carpenter*, 529 U.S. at 451; *see also Coleman*, 501 U.S. at 753-54 (explaining that "[a]ttorney ignorance or inadvertence is not 'cause,'" but "[a]ttorney error that constitutes ineffective assistance of counsel is cause").

A prisoner who cannot demonstrate cause and prejudice may invoke the miscarriage-of-justice exception to obtain review of a procedurally defaulted claim. *Coleman*, 501 U.S. at 750. But that exception applies only if the petitioner presents a credible claim of actual innocence. *See McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) ("[A] credible showing of actual innocence may allow a prisoner to pursue his constitutional claims . . . on the merits notwithstanding the existence of a procedural bar to relief."). "To be credible, a claim of actual innocence requires a petitioner to present 'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" *Fontenot v. Crow*, 4 F.4th 982, 1031 (10th Cir. 2021) (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)). "In

13

assessing the adequacy of a petitioner's showing, 'the habeas court must consider "all the evidence," old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under "rules of admissibility that would govern at trial,"'" *Fontenot*, 4 F.4th at 1031-32 (quoting *House v. Bell*, 547 U.S. 518, 538 (2006)), and make "a holistic judgment about 'all the evidence,' and its likely effect on reasonable jurors applying the reasonable-doubt standard," *House*, 547 U.S. at 539 (quoting *Schlup*, 513 U.S. at 328). Ultimately, "prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House*, 547 U.S. at 537-38 (quoting *Schlup*, 513 U.S. at 327). This is a "demanding" standard, *Perkins*, 569 U.S. at 401, because the purpose of the miscarriage-of-justice exception is to ensure "that in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default," *Carrier*, 477 U.S. at 496.

Even if a state prisoner presents a timely habeas petition asserts only properly exhausted federal claims, and either satisfies § 2254(d)'s standards or makes the showings necessary to overcome the procedural default of his federal claims, the prisoner is not necessarily entitled to federal habeas relief. Rather, the prisoner is merely entitled to de novo review of his federal claims. *Cuesta-Rodriguez v. Carpenter*, 916 F.3d 885, 898 (10th Cir. 2019); *Milton v. Miller*, 744 F.3d 660, 670-71 (10th Cir. 2014). De novo review is also available for "[c]laims that the state court didn't adjudicate on the merits." *Cuesta-Rodriguez*, 916 F.3d at 898. If the federal court's independent review of the federal claim reveals a constitutional error, the court "must assess [the error's] prejudicial impact . . . under the 'substantial and injurious effect' standard set forth in

*Brecht* [*v. Abrahamson*, 507 U.S. 619 (1993)], whether or not the state appellate court recognized the error and reviewed it for harmlessness." *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007).  Under the *Brecht* standard, a federal court will grant habeas relief only if the court "is in grave doubt as to the harmlessness of an error that affects substantial rights." *O'Neal v. McAninch*, 513 U.S. 432, 445 (1995).

## II.    Analysis

Hendrick claims his state custody under the challenged judgment and sentence is unlawful because the prosecutor's misconduct during closing arguments deprived him of a fair trial (claims one and six), trial counsel's and appellate counsel's errors deprived him of his Sixth Amendment right to the effective assistance of counsel (claims two, four and five), the trial court abused its discretion by permitting the State to submit Ratliff's victim-impact statement that was not authorized by state law (claim three), and the evidence presented at trial was insufficient to support his convictions (claim seven).

Whitten contends in his response that Hendrick is not entitled to federal habeas relief because the OCCA adjudicated claims one, two, and four on the merits and Hendrick cannot show that the OCCA's resulting decision as to those claims is contrary to clearly established federal law, based on an unreasonable application of the law or based on an unreasonable determination of the facts.  Whitten further contends claim three alleges only an error of state law, and thus provides no basis for federal habeas relief.  Finally, Whitten contends claims five, six and seven are procedurally defaulted because the OCCA rejected those claims on the basis of independent and adequate state procedural rules, and further contends Hendrick cannot make the showings necessary to overcome the procedural default of those claims.

Hendrick argues that this Court should review his procedurally defaulted claims because

appellate counsel was ineffective for failing to raise claims five, six and seven on direct appeal, he argued appellate counsel's ineffectiveness as to raising these claims in state court even though "the state court's failed to liberally construe" his ineffective-assistance-of-appellate-counsel claim, and he asserted his actual innocence in state postconviction proceedings.  Dkt. 13, Reply Br., 4; *see also* Dkt. 1-1, Pet'r's Br., 1.

### A.    Prosecutorial misconduct (claim one)

In claim one, Hendrick alleges that the prosecutor committed misconduct during closing arguments by stating:

> There are consequences for carrying a firearm when you know you're not supposed to.  And make no mistake, he knows he's not supposed to.  He knows that.  And despite being told that over and over and over and over and over again, he just has apparently not cared.

Dkt. 1, Pet., 5; Dkt. 1-1, Pet'r's Br., 27-28, 38.  Relying on the same argument he presented to the OCCA on direct appeal, Hendrick asserts that "[n]o evidence was presented at trial that [he] was told numerous times that he could not carry a firearm."  Dkt. 1-1, Pet'r's Br., 27-28.

Under clearly established federal law, improper prosecutorial comments rise to the level of a constitutional violation only when the remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)).  Even when a prosecutor makes improper remarks, they take on constitutional dimension only when they are "so egregious as to constitute a miscarriage of justice."  *United States v. Hernandez-Muniz*, 170 F.3d 1007, 1012 (10th Cir. 1999); *see also Hooper v. Mullin*, 314 F.3d 1162, 1172 (10th Cir. 2002) (explaining that when "challenged remarks do not implicate a specific constitutional right, [a] [p]etitioner is entitled to habeas relief only if he can establish that the prosecutor's argument, viewed in light of the trial as a whole, resulted in a fundamentally unfair proceeding").

16

The OCCA rejected Hendrick's prosecutorial-misconduct claim.  Because Hendrick did not object at trial to the prosecutor's statements regarding Hendrick's knowledge of prior felony convictions, the OCCA reviewed the claim under its plain-error standard.  Dkt. 10-4, OCCA Op., 3-4.  The OCCA stated that it would grant relief only if "the prosecutor's flagrant misconduct so infected the defendant's trial that it rendered the trial fundamentally unfair."  Dkt. 10-4, OCCA Op., 4.  In rejecting Hendrick's claim, the OCCA noted that the prosecutor made the challenged statements "after the jury had found Hendrick guilty of possession of a firearm after former conviction of a felony" and after "[e]vidence had been presented that Hendrick had several felony convictions dating back to 2007."  Dkt. 10-4, OCCA Op., 4.  The OCCA reasoned "[t]hat [Hendrick] had been advised and knew that as a convicted felon he could not legally possess a firearm was a reasonable inference based on evidence presented at trial."  Dkt. 10-4, OCCA Op., 4.  The OCCA thus found no error, "plain or otherwise," and rejected the prosecutorial-misconduct claim.  Dkt. 10-4, OCCA Op., 4.

The Court agrees with Whitten that § 2254(d) bars relief as to this claim.  The OCCA's adjudication of this claim was not contrary to clearly established federal law because the OCCA correctly identified the controlling legal principle by considering whether the challenged remarks rendered Hendrick's trial fundamentally unfair.  *Darden*, 477 U.S. 181; *Hooper*, 314 F.3d 1172. In addition, when the OCCA reviews a claim under its plain-error standard, it effectively applies the same test that federal courts apply to assess an alleged due-process violation.  *Thornburg v. Mullin*, 422 F.3d 1113, 1124-25 (10th Cir. 2005).  Thus, the only question under § 2254(d)(1) is whether the OCCA unreasonably applied the federal due-process test, *Thornburg*, 422 F.3d at 1125, and the question under § 2254(d)(2) is whether the OCCA unreasonably determined the facts relevant to Hendrick's claim in light of the evidence presented in state court.  The answer to both

questions is no.  As the OCCA reasoned, a prosecutor is granted "a reasonable amount of latitude in drawing inferences from the evidence during closing summation."  *Duvall*, 139 F.3d at 795 (quoting *United States v. Manriquez Arbizo*, 833 F.2d 244, 247 (10th Cir. 1987)).  The OCCA found, and the record supports, that the prosecutor made the challenged remarks after presenting evidence to the jury that Hendrick possessed the gun he used to shoot Singleton after Hendrick had been previously convicted of seven felonies.  Dkt. 11-6, Tr. Trial vol. 3, 149-67 [592-610], 175-78 [618-21], 180-82 [623-25].  Under these circumstances, Hendrick fails to show that the OCCA's rejection of his claim was objectively unreasonable, either as a matter of fact or a matter of law.  Because § 2254(d) bars relief, the Court denies the petition as to claim one.

**B.      Ineffective assistance of trial counsel (claim two)**

In claim two, Hendrick argues trial counsel provided ineffective assistance by (1) failing to timely object to the admission of State's Exhibits 8 through 13, 16 and 17, all of which are screenshots of Facebook messages depicting the conversation that occurred between Hendrick and Ratliff on the morning of the shooting, (2) failing to object to the State's presentation of the videotape of P.H.'s interview with Detective Ritter to impeach P.H.'s trial testimony, and (3) failing to object to the prosecutor's allegedly improper comments (described in claim one) regarding Hendrick's knowledge that he was prohibited from possessing a firearm.  Dkt. 1-1, Pet'r's Br., 29-32.

The Sixth Amendment guarantees a criminal defendant the right to assistance of counsel, and the Supreme Court has interpreted this right as providing "the right to the effective assistance of counsel."  *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the

adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.  And the framework for assessing any such claim requires a reviewing court to consider (1) whether counsel performed deficiently and, if so, (2) whether counsel's deficient performance prejudiced the defendant.  *Id.* at 687.  A defendant can demonstrate deficient performance by showing that counsel's alleged acts or omissions were objectively unreasonable "under prevailing professional norms."  *Id.* at 687-88.  To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*

Applying *Strickland*, the OCCA thoroughly discussed the facts relevant to each of trial counsel's alleged deficiencies and rejected Hendrick's Sixth Amendment claim.  First, the OCCA reasoned that "[t]he [Facebook] messages at issue were relevant and their probative value was not substantially outweighed by the danger of unfair prejudice," thus, trial counsel was not "ineffective for failing to object to admissible evidence."  Dkt. 10-4, OCCA Op., 5-6.  Second, regarding the State's impeachment of its own witness, P.H., the OCCA explained that

> P.H. was interviewed by the police after the shooting.  At trial, P.H. was called as a witness for the State and when asked about what had happened, he told a significantly different story than the one he told the detective during the interview. The State impeached P.H.'s trial testimony with a portion of the videotaped interview he had given before trial.  Defense counsel did not object to this impeachment evidence and Hendrick complains on appeal that this failure to object rendered counsel's assistance constitutionally ineffective.

19

Dkt. 10-4, OCCA Op., 6 (footnote omitted).[12]   The OCCA disagreed, reasoning that trial counsel did not perform deficiently by failing to object because the State substantially complied with the proper procedures for introducing the impeachment evidence.  Dkt. 10-4, OCCA Op., 6-7.  Third, the OCCA determined that trial counsel did not perform deficiently by failing to object to the prosecutor's statements regarding Hendrick's prior knowledge that he could not lawfully possess a firearm due to multiple felony convictions because the OCCA had already determined those statements were grounded in the evidence and thus not improper.  Dkt. 10-4, OCCA Op., 7.  Because the OCCA found that trial counsel's performance was not deficient, it did not expressly discuss *Strickland*'s second prong: prejudice.  Dkt. 10-4, OCCA Op., 5-7.

In support of claim two, Hendrick reasserts the arguments he presented to the OCCA on direct appeal.  In doing so, he seems to suggest that this Court should consider anew whether trial counsel performed deficiently and prejudicially for the reasons alleged.  But habeas review of a Sixth Amendment ineffective-assistance-of-counsel claim under § 2254(d) is limited.   "When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 562 U.S. 86, 105 (2011); *see also Harmon v. Sharp*, 936 F.3d 1044, 1057-58 (10th Cir. 2019) (discussing framework for habeas review of ineffective-assistance-of-counsel claims).  Because the OCCA applied *Strickland*'s deferential standard, Hendrick cannot show that

---

[12] As the OCCA noted, "During the interview P.H. told the detective that when Hendrick arrived at [Ratliff's] apartment to pick him up, P.H. got into Hendrick's car.  Hendrick got out of the car, came back to the car, and left the car again.  After Hendrick left the car the second time, P.H. heard a bang then Hendrick came back to the car and they drove away quickly.  During trial, P.H. testified that when Hendrick came to pick him up Hendrick got out of the car but didn't go into the apartment courtyard.  P.H. testified that Hendrick waited on the sidewalk and Ratliff walked to him and handed him his hoodie.  Then Hendrick and P.H. drove off in the car."  Dkt. 10-4, OCCA Op., 6 n.3; *see also* Dkt. 11-5, Tr. Trial vol. 2, 182-91 [422-31] (P.H.'s trial testimony); Dkt. 12, Court's Ex. 1, generally.

the OCCA's decision is contrary to Supreme Court precedent.  Likewise, he cannot show that the OCCA unreasonably applied *Strickland*.  As permitted by *Strickland*, the OCCA addressed only the performance prong and found no deficient performance before rejecting his claim.  *See Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding in ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").  Having reviewed the state-court record in its entirety, the Court finds that Hendrick has not "show[n] that the state court's ruling [on his Sixth Amendment claim] was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.  As a result, § 2254(d) bars habeas relief, and the Court denies the petition as to claim two.

### C.    Admission of victim-impact statement (claim three)

In claim three, Hendrick reasserts his claim that the trial court abused its discretion by admitting at his sentencing hearing, over his objection, a victim-impact statement written by Ratliff, the mother of Singleton's son. Dkt. 1, Pet., 8; Dkt. 1-1, Pet'r's Br., 33-34, 41-42.  Hendrick argues that state law defines who may provide a victim impact statement and that Ratliff, because she was not married to Singleton, "did not fall within the parties of people who can give one." Dkt. 1-1, Pet'r's Br., 33.

Whitten contends this claim asserts only an error of state law and does not present a cognizable federal claim. Dkt. 10, Resp., 19-22.  The Court agrees.  The OCCA relied entirely on state law to reject this claim. Dkt. 10-4, OCCA Op., 7-8.  The OCCA stated,

> Under 21 O.S. Supp. 2014, § 142A-1(1), in a homicide case, a surviving family member may be considered a "crime victim."  Title 21 O.S. 2011, § 142A-8(A) provides that "[e]ach victim, or members of the immediate family of each victim . . . may present a written impact statement . . .."  A parent of a victim is

> included within the definition of "[m]embers of the immediate family."  21 O.S. Supp. 2014, § 142A-1(4).  Thus it was not dispositive that Ratliff was not married to Singleton because Singleton was not the only victim of the murder.  Under section 142A-1(1), Singleton's child, B.S., was also a victim when Singleton was murdered.  Because B.S. was a victim, his mother, Ratliff, as a member of his immediate family, was statutorily authorized to present a written victim impact statement to be filed of record in this case.  There was no error here and relief is not required.

Dkt. 10-4, OCCA Op., 8 (footnote omitted).

Hendrick fails to explain how the issue asserted in claim three implicates federal law.  To the extent Hendrick argues that the OCCA either misinterpreted or misapplied state law when it rejected his interpretation of state law as not permitting Ratliff to submit a written victim-impact statement, he fails to present a cognizable federal habeas claim.  *See Wilson*, 562 U.S. at 5 (noting that federal habeas court reviews only claims alleging noncompliance with federal law); *Mullaney v. Wilbur*, 421 U.S. 684 (1975) ("[S]tate courts are the ultimate expositors of state law . . . and [federal courts] are bound by their constructions except in extreme circumstances."); *Dennis v. Poppel*, 222 F.3d 1245, 1257 (10th Cir. 2000) (noting that federal courts sitting as habeas courts "are bound to accept the Oklahoma court's construction of its state statutes").  Because this claim alleges only an error of state law, the Court denies the petition as to claim three.

### D.    Ineffective assistance of appellate counsel (claim four)

In his fourth claim, Hendrick alleges he was deprived of his Sixth Amendment right to the effective assistance of counsel on direct appeal because appellate counsel did not raise the ineffective-assistance-of-trial-counsel claim he asserts in claim five, the prosecutorial-misconduct claim he asserts in claim six, and the sufficiency-of-the-evidence claim he asserts in claim seven. Dkt. 1, Pet., 10; Dkt. 1-1, Pet'r's Br., 1.

The Sixth Amendment right to the effective assistance of counsel extends to a criminal defendant's first appeal as of right.  *See Evitts v. Lucey*, 469 U.S. 387, 396 (1985) ("A first appeal

as of right therefore is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney.").  A claim that appellate counsel did not provide effective assistance, like an ineffective-assistance-of-trial-counsel claim, is evaluated under *Strickland*'s two-part inquiry.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000).  Thus, a petitioner alleging he was denied effective assistance on appeal must show deficient performance and resulting prejudice.  *Robbins*, 528 U.S. at 285-86.  To demonstrate deficient performance, the petitioner generally must establish that appellate counsel "unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them," *id*. at 285, or that the issues appellate counsel raised on appeal were significantly weaker than the issues counsel failed to raise, *Cargle v. Mullin*, 317 F.3d 1196, 1202-03 (10th Cir. 2003).  To establish prejudice, the petitioner must show "a reasonable probability that, but for counsel's unprofessional error(s), the result of the proceeding—in this case the appeal—would have been different."  *Cargle*, 317 F.3d at 1202. "Thus, in analyzing an appellate ineffectiveness claim based upon the failure to raise an issue on appeal, '[courts] look to the merits of the omitted issue,' generally in relation to the other arguments counsel did pursue."  *Cargle*, 317 F.3d at 1202 (internal citations omitted) (quoting *Neill v. Gibson*, 278 F.3d 1044, 1057 (10th Cir. 2001).

Hendrick raised an ineffective-assistance-of-appellate-counsel claim in his application for postconviction relief.  There, he argued that appellate counsel provided ineffective assistance by:

> (1) refusing to visit with Hendrick and raise an issue on appeal regarding trial counsel's failure to present at trial recordings of phone conversations (referred to in some pleadings as "jail calls") between Ratliff and Hendrick following Hendrick's arrest,

> (2) failing to interview Hendrick's mother, Tonda Hendrick, and raise an issue on appeal regarding trial counsel's failure to interview Tonda and present her testimony regarding Facebook messages she received from Ratliff after the shooting, and

> (3) failing to investigate or raise a claim that trial counsel was ineffective for not

23

investigating and presenting evidence at trial regarding 2014 and 2015 Department
of Human Services (DHS) investigations involving Ratliff's son, B.S.

Dkt. 10-5, Appl., 2, 7-13.[13]  On postconviction appeal, however, Hendrick narrowed his claim by

asserting arguments focused solely on his allegation that appellate counsel should have argued trial

counsel's ineffectiveness regarding presentation of the jail calls.  Dkt. 10-8, PC Br., 1-7.

The OCCA addressed and rejected Hendrick's claim as it was presented in state court.

Applying *Strickland*, the OCCA stated,

> The appeal record does not support the claim that counsel's performance
> was either deficient or resulted in prejudice.  Hendrick must show a reasonable
> probability that appellate counsel would have prevailed on direct appeal had he
> argued this proposition of error in the manner that Hendrick now presents it in this
> postconviction appeal.  We find no such error in appellate counsel's representation.
> *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064.
>
> As noted by Judge LaFortune, trial counsel made an extensive record at
> trial, outside of the hearing of the prosecution and the jury, outlining his reasons
> for not using the jail phone calls which Hendrick now claims would have resulted in a
> different outcome.  Counsel's trial strategy was based on law and investigation of
> facts sufficient to show that his actions were sound.  Hendrick is unable to show on
> this record that counsel's actions were objectively unreasonable and resulted in
> prejudice sufficient to warrant reversal of his conviction.  We also find nothing in
> this record warranting remand of this matter for an evidentiary hearing.

Dkt. 10-10, OCCA Order, 5-7.

In support of claim four, Hendrick reasserts that appellate counsel failed to adequately

argue trial counsel's ineffectiveness by omitting the jail-calls issue from the ineffective-assistance-

---

[13] The state district court construed Hendrick's ineffective-assistance-of-appellate-counsel
claim as limited to the jail-calls issue. Dkt. 10-7, Dist. Ct. Order, 6-10.  As Hendrick argues, a fair
reading of his application for postconviction relief demonstrates that the state district court
misunderstood the scope of his claim because Hendrick clearly identified three specific allegations
of trial counsel's alleged ineffectiveness that he argued should have been raised by appellate
counsel. Dkt. 10-5, Appl., 8-13.  Though not entirely clear, it appears that the State, in its response
to the application for postconviction relief, mischaracterized the scope of Hendrick's claim, and
that the state district court adopted that mischaracterization.  *See* Dkt. 1-1, Pet'r's Br., 84-87 and
Dkt. 1-2, Pet'r's Br., 1-5 (State's response); Dkt. 10-7, Dist. Ct. Order, 3, 6-10.

of-trial-counsel claim that was raised on direct appeal.  Dkt. 1-1, Pet'r's Br., 1, 2-6.[14]  For three

reasons, the Court finds that § 2254(d) bars relief as to claim four.  First, the OCCA correctly

identified *Strickland* as the clearly established federal law governing Hendrick's claim.  *See*

*Robbins*, 528 U.S. at 285 (noting that the *Strickland* standard applies to claims alleging ineffective

assistance of appellate counsel); *Cargle*, 317 F.3d at 1202 (same).  Second, the OCCA applied

*Strickland* in an objectively reasonable manner by considering the merits of Hendrick's underlying

claim that trial counsel was ineffective for failing to present the jail calls at trial to impeach

Ratliff's testimony.  *See Cargle*, 317 F.3d at 1202 ("[I]n analyzing an appellate ineffectiveness

claim based upon the failure to raise an issue on appeal, 'we look to the merits of the omitted

issue,' . . . generally in relation to the other arguments counsel did pursue." (quoting *Neill v.*

*Gibson*, 278 F.3d 1044, 1057 (10th Cir. 2001)).

Third, and most significantly, the OCCA's assessment of that underlying claim is based on

a reasonable determination of the facts in light of the evidence presented in state court.  28 U.S.C.

---

[14] Hendrick argues, in claim four, that appellate counsel was ineffective for failing to argue (1) that trial counsel was ineffective for (a) failing to introduce the jail calls to impeach Ratliff's testimony, (b) failing to effectively impeach B.G.'s testimony, and (c) failing to present Tonda Hendrick's testimony about Facebook messages she received from Ratliff after the shooting (claim five), (2) that the prosecutor committed misconduct during closing arguments by referring to statements P.H. made during his interview with Detective Ritter and by suggesting that P.H. identified Hendrick as the shooter (claim six), and (3) that the evidence was not sufficient to support Hendrick's convictions (claim seven).  Dkt. 1-1, Pet'r's Br., 1-14.  However, as Whitten contends, the only portion of claim four that is properly exhausted is that portion alleging the omission of the jail-calls issue.  Hendrick procedurally defaulted the remainder of claim four.  As a result, he cannot rely on the unexhausted portion of claim four to establish cause to overcome the procedural default of any claims.  *Carpenter*, 529 U.S. at 451-52.  Further, Hendrick's undeveloped assertion of actual innocence fails to present a credible claim of actual innocence that would excuse the procedural default.  The Court therefore considers claim four only as it was fairly presented to the OCCA on postconviction appeal.

§ 2254(d)(2).  First, following voir dire of the original jury panel,[15] the trial court held an ex parte

discussion with Hendrick and his trial counsel, Mr. Graves.  Dkt. 11-3, Tr. Trial (mistrial), 210.

Graves explained that, at Hendrick's request, he had obtained recordings of calls between Ratliff

and Hendrick that were made following his arrest.  Dkt. 11-3, Tr. Trial (mistrial), 210.  Graves

informed the trial court that "[i]n some of those phone calls [Ratliff] discusses an incident where

she was jumped and she didn't cooperate with the police and how people thought she had

something to do with" Singleton's murder.  Dkt. 11-3, Tr. Trial (mistrial), 210-11.  Graves stated

that he and Hendrick disagreed as to whether the calls would be presented at trial and explained

that, contrary to Hendrick's wishes, he had no intent to use them to impeach Ratliff's testimony.

Dkt. 11-3, Tr. Trial (mistrial), 211.  Graves explained, "In each and every phone call [Ratliff], in

a very emotional manner, states, you killed [Singleton] or you killed the love of my life or you

killed my best friend," and Graves stated, "the last thing I would want is the jury to hear repeatedly,

you killed Robert Singleton."  Dkt. 11-3, Tr. Trial (mistrial), 211.  Hendrick explained to the trial

court that he believed one particular phone call would be useful as impeachment evidence because,

in that call, Ratliff "was talking about being beat up," and said that "people" thought she "set

[Singleton] up and they want to kill her and she has to leave town."  Dkt. 11-3, Tr. Trial (mistrial),

215.  Hendrick acknowledged that, in that same call, Ratliff "keeps saying, you did it," referring

to Hendrick killing Singleton, but Hendrick stated that he kept "denying everything."  Dkt. 11-3,

Tr. Trial (mistrial), 215.  Ultimately, Graves stated that after Ratliff testified, he could determine

whether any statements in the calls would be relevant as impeachment evidence, but further stated

---

[15] Hendrick's trial began on March 7, 2016, but ended in a mistrial the next morning after Ratliff inadvertently mentioned Hendrick's prior incarceration during her testimony.  Dkt. 11-3, Tr. Trial (mistrial), 1, 273-76.  Between March 9, 2016, and March 11, 2016, Hendrick's case was tried to a new jury.  Dkts. 11-4, 11-5, 11-6.

that he would "still have concerns about playing those phone calls, big concerns." Dkt. 11-3, Tr. Trial (mistrial), 220-21. Next, after the new jury was selected but before opening statements and outside the presence of the jury, the trial court addressed "several motions that ha[d] been filed" by Hendrick, including one filed May 29, 2015. Dkt. 11-5, Tr. Trial vol. 2, 4 [244]. The trial court described that motion as one "regard[ing] jail calls and basically what would be potentially, the [c]ourt will rule later on that, potentially impeachment evidence." Dkt. 11-5, Tr. Trial vol. 2, 4 [244]; *see also* Dkt. 11-9, O.R., 47-48 [42-43] (Hendrick's motion filed May 29, 2015). The following colloquy then occurred between the trial court and Mr. Graves:

> The Court:       And I take that filing, Mr. Graves, to be something—this is public record—something of strategy between you and your client as to the trial proceedings.
>
> Mr. Graves:      As to how those phone calls are used, yes.
>
> The Court:       Right.  So I don't need to rule on this letter.
>
> Mr. Graves:      To the extent that it is a request for discovery, the State did provide those.
>
> The Court:       The State did provide the jail calls?
>
> Mr. Graves:      Yes, sir.
>
> The Court:       Good.  Excellent.  Okay.  Let's go to the next one which is a motion, June 10, 2015, handwritten motion by Mr. Hendrick which attaches that May filing as an exhibit, and it's a motion to disqualify the prosecution's main witness, Brittish Ratliff, because her testimony is full of lies and not credible.  So I'll overrule or deny that motion with an exception to the defendant.
>
> . . .
>
>           All right.  Then let's see.  Hold on.  There was a filing that was another June—they're out of order.  That was June 10th, and then there's a June 5th that shows up in the court file later which is also about the jail calls.  That's all about Mr. Graves' cross-examination, whether he's going to use it as impeachment, whether I allow him to use it as impeachment.  So we won't worry about that one.
>
> . . .

Dkt. 11-5, Tr. Trial vol. 2, 4-6 [244-46].

27

Later, after Ratliff testified and outside the presence of the jury and the State's attorneys, the trial court permitted Graves to further develop a record on the issue of the recorded jail calls. Dkt. 11-5, Tr. Trial vol. 2, 99 [339]. Graves again stated that he had reviewed "each and every one of the phone calls that involved [Ratliff]," stated that Ratliff in one call "appears to say she does not know who killed [Singleton]" and in one call "states someone has beaten her up and is going to try to kill her" but also states in the latter call that Hendrick killed Singleton. Dkt. 11-5, Tr. Trial vol. 2, 99-101. Graves described the substance of all but one of the calls as including repeated statements from Ratliff telling Hendrick "either, you killed baby daddy or you killed the love of my life or you killed my best friend." Dkt. 11-5, Tr. Trial vol. 2, 99-101 [339-41]. Graves told the trial court that he did not want the jury to hear either the substance of the calls or "the tone that is going on" in the calls, and clarified that he was referring to both Ratliff's and Hendrick's tone. Dkt. 11-5, Tr. Trial vol. 2, 100-01 [340-41].

On this record, the Court finds it was objectively reasonable for the OCCA to conclude that trial counsel did not perform deficiently by failing to present the recordings of jail calls to impeach Ratliff's testimony. *See Harris v. Sharp*, 941 F.3d 962, 973 (10th Cir. 2019) ("Strategic decisions after a 'thorough investigation' are afforded even greater deference and are 'virtually unchallengeable.'" (quoting *Strickland*, 466 U.S. at 690)). As a result, it was objectively reasonable for the OCCA to further conclude that appellate counsel did not perform deficiently by failing to challenge trial counsel's effectiveness as to this issue. The Court therefore denies the petition as to claim four because § 2254(d) bars relief.

## E.     Ineffective assistance of trial counsel (claim five)

In claim five, Hendrick alleges trial counsel performed deficiently and prejudicially by (1) failing to present the jail calls to impeach Ratliff's testimony, (2) failing to effectively impeach

28

B.G.'s testimony identifying Hendrick as the shooter, and (3) failing to interview and present testimony from Hendrick's mother, Tonda Hendrick, regarding Facebook messages she received from Ratliff after the shooting.  Dkt. 1, Pet., 12; Dkt. 1-1, Pet'r's Br., 2-10.

Hendrick raised slightly different allegations to support the ineffective-assistance-of-trial-counsel claim he presented in his application for postconviction relief.  There, he alleged trial counsel was ineffective (1) for failing to present at trial the recorded jail calls, (2) for failing to interview and present testimony from Tonda Hendrick regarding Facebook messages she received from Ratliff after the shooting, (3) for failing to investigate and present evidence of Department of Human Services (DHS) investigations in 2014 and 2015 involving Ratliff's son, (4) for stating during closing arguments that he did not expect P.H. to change his story, failing to emphasize that P.H. denied seeing Hendrick with a gun, and failing to point out inconsistencies in the testimony of Ratliff and B.G., and (5) for failing to object to the prosecutor's remarks during closing arguments referencing P.H.'s request to speak with Ratliff and stating that P.H. identified Hendrick as the shooter.  Dkt. 10-5, Appl., 14-29.

The OCCA applied a procedural bar and declined to review the ineffective-assistance-of-trial-counsel claim raised on postconviction appeal, reasoning that Hendrick challenged trial counsel's effectiveness on direct appeal.  Dkt. 10-10, OCCA Order, 5.  As just discussed, the claim Hendrick presented in his application for postconviction relief alleged five grounds to support trial counsel's allegedly deficient performance all of which differed from the three alleged deficiencies identified on direct appeal.  But all of his allegations regarding trial counsel's allegedly deficient performance were available for presentation on direct appeal.  Thus, as Whitten argues, claim five is procedurally defaulted because the OCCA applied an independent and adequate state procedural rule to bar review of this claim.  *See Davila*, 137 U.S. at 2064-65; *see also Harmon*, 936 F.3d at

1060 ("In Oklahoma, a defendant must assert any available ineffective assistance of counsel claims on direct appeal, or the defendant waives those claims."); *Sporn v. Oklahoma*, 139 P.3d 953, 953-54 (Okla. Crim. App. 2006) ("As with all other claims that could have been raised upon direct appeal, a claim of ineffective assistance of trial counsel, available at the time of a defendant's direct appeal, must be presented in that direct appeal or it is waived.").

Hendrick attempts to avoid the procedural default of claim five, in part, by asserting that appellate counsel was ineffective for failing to adequately argue trial counsel's ineffectiveness on the grounds identified in claim five.  As previously noted, Hendrick exhausted an ineffective-assistance-of-appellate-counsel claim only as to the failure to argue trial counsel's ineffectiveness regarding the failure to present jail calls to impeach Ratliff's testimony. *See supra* n.14.  And, as just discussed in the analysis of claim four, the OCCA reasonably rejected Hendrick's argument that appellate counsel was ineffective for failing to argue that trial counsel performed deficiently and prejudicially with respect to the presentation of jail calls.  Because Hendrick fails to demonstrate that appellate counsel provided constitutionally ineffective assistance, he cannot establish cause to overcome the procedural default of claim five. *Carpenter*, 529 U.S. at 451-52.  And, again, the Court finds nothing in the record to support a credible claim of actual innocence.  Because the procedural-default doctrine bars habeas review, the Court denies the petition as to claim five.[16]

---

[16] The OCCA effectively adjudicated the portion of claim five related to the jail-calls issue when it analyzed Hendrick's ineffective-assistance-of-appellate-counsel claim.  But, for the same reasons discussed in the analysis of claim four, the Court finds that § 2254(d) bars relief as to that portion of claim five.  Thus, even if that portion of claim five is not procedurally defaulted, Hendrick is not entitled to federal habeas relief.

F.      **Prosecutorial misconduct (claim six)**

In claim six, Hendrick alleges that the prosecutor made improper and prejudicial remarks

during closing argument regarding statements P.H. made during the videotaped interview with

Detective Ritter.  Dkt. 1, Pet., 13; Dkt. 1-1, Pet'r's Br., 11-12.  Hendrick specifically challenges

the following statements:

> And within an hour or two after that shooting, his own brother is asking police, why
> did he do that, my brother didn't have any reason to do that.  And he asked Detective
> Ritter, [P.H.] did, can I talk to Brittish.  I don't want what my stupid brother did to
> get in the way of us.  His own brother says it's him.

Dkt. 1-1, Pet'r's Br., 11; *see* Dkt. 11-6, Tr. Trial vol. 3, 134 [577].  Hendrick argues these

statements were improper because the record does not support that P.H. "ever identif[ied]

[Hendrick] as the shooter."  Dkt. 1-1, Pet'r's Br., 11.

Hendrick raised this claim for the first time in his application for postconviction relief both

as an independent claim and as one of five grounds alleged to support his ineffective-assistance-

of-trial-counsel claim.  Dkt. 10-5, Appl., 28-29, 39-40.  The OCCA declined to address the alleged

prosecutorial misconduct, as to either claim, because it determined that both claims were raised

and rejected on direct appeal.  Dkt. 10-10, OCCA Order, 5.  As previously discussed, Whitten

therefore contends Hendrick procedurally defaulted claim six.  Hendrick urges the Court to

overlook the procedural default because he argued in state court that appellate counsel was

ineffective for failing to raise this claim and that he is actually innocent.  The Court previously

noted that Hendrick did not fairly present this claim under the rubric of his ineffective-assistance

of-appellate-counsel claim and that he provides no evidence to support his assertion of actual

innocence.  *See supra* n.14.  However, because claim six is easily resolved on the merits, the Court

exercises its discretion to overlook the procedural default.  *See Smith v. Duckworth*, 824 F.3d 1233,

1242 (10th Cir. 2016) (noting that if a "'claim may be disposed of in a straightforward fashion on

31

substantive grounds,'" a habeas court "retains discretion to bypass the procedural bar and reject the claim on the merits" (quoting *Revilla v. Gibson*, 283 F.3d 1203, 1210-11 (10th Cir. 2002))).

The Court has reviewed the videotape of P.H.'s interview and the entirety of the trial transcripts.  The prosecutor's allegedly improper remarks that P.H. asked to talk to Ratliff about "what [his] stupid brother did" and that Hendrick's "own brother says" Hendrick is the shooter were fair comments on the evidence and reasonable inferences drawn from P.H.'s statements to Detective Ritter that were admitted at trial.  As previously discussed, P.H. asked Detective Ritter if he could talk to Ratliff and he specifically told Ritter that he was friends with Ratliff's son, that he felt bad about the shooting, and that he did not want "his stupid brother" to "mess[]" with his relationship with Ratliff and her son.  Further, it was reasonable to infer from P.H.'s statements to Ritter about the sequence of events that took place on the morning of the shooting that P.H. assumed Hendrick shot Singleton.  P.H. told Ritter that he got into Hendrick's car, Hendrick got out, Hendrick came back and left again, P.H heard a "bang," Hendrick got in and appeared to be holding something under his arm and under his jacket, and Hendrick drove off in a hurry.  When Ritter asked P.H. if Hendrick said anything as he drove off, P.H. responded only that Hendrick said he was taking P.H. home.  P.H. also denied seeing a gun.  But he appeared to assume that Hendrick shot Singleton because P.H. also stated that Hendrick "didn't need to do that" because "it was really unnecessary to shoot someone."  Based on the evidence presented at trial, the prosecutor's remarks about P.H.'s statements were within the permissible bounds of closing argument.  Further, even if the remarks could be considered improper in some way, they were not sufficiently egregious in light of the evidence as a whole, to render Hendrick's trial fundamentally unfair.  *Darden*, 477 U.S. 181; *Hooper*, 314 F.3d 1172.

Thus, even assuming without deciding that Hendrick could overcome the procedural

default of this claim and applying de novo review, the Court finds that Hendrick is not entitled to federal habeas relief.  The Court therefore denies the petition as to claim six.

### G.     Insufficient evidence (claim seven)

In his seventh and final claim, Hendrick alleges the evidence was not sufficient to support his convictions.  Dkt. 1-1, Pet'r's Br., 13.

Hendrick first raised this claim in his application for postconviction relief.  The OCCA determined that Hendrick waived this claim by failing to raise it on direct appeal, and the record supports that determination.  Thus, as Whitten argues, Hendrick procedurally defaulted claim seven.  *See Davila*, 137 S. Ct. at 2064-65; *Sporn*, 139 P.3d at 953-54 (noting that "claims that could have been raised upon direct appeal" that are "available at the time of a defendant's direct appeal, must be presented in that direct appeal or [they are] waived").  And, even a liberal construction of Hendrick's pleadings fails to demonstrate that he can make the showings necessary to overcome the procedural default.  First, he did not fairly present an argument in state court that appellate counsel performed deficiently or prejudicially by failing to challenge the sufficiency of the evidence.[17]  Thus, he cannot rely on appellate counsel's alleged ineffectiveness to establish "cause" for the procedural default of this claim.  *Carpenter*, 529 U.S. 451-52.  Second, as previously discussed, Hendrick has not presented a credible claim of actual innocence that would

---

[17] On the second page of his application for postconviction relief, Hendrick stated, without argument, that appellate counsel "failed to mention exculpatory evidence ineffective appellate counsel failed to mention insufficient evidence."  Dkt. 10-5, Appl., 2.  On page 12 of the application, Hendrick asserted, in what appears to be the conclusion of his argument that appellate counsel was ineffective for three specific reasons, that appellate counsel "was ineffective not raising appellants exculpatory evidence and witnesses and the insufficiency of the evidence for this conviction based on a liars testimony."  Dkt. 10-5, Appl., 12.  Even with the benefit of liberal construction, the Court does not read these passing references to the sufficiency of the evidence as fairly presenting a claim, allegation or argument that appellate counsel was ineffective for failing to raise a claim on direct appeal challenging the sufficiency of the evidence.

excuse the procedural default.  For these reasons, the Court finds that the procedural-default doctrine bars review of this claim and thus denies the petition as to claim seven.

### CONCLUSION

Based on the foregoing, the Court concludes that Hendrick has not shown that his custody under the challenged judgment and sentence violates the Constitution or other federal law.  The Court therefore denies his petition for writ of habeas corpus.  28 U.S.C. § 2254(a).    Further, because reasonable jurists would not debate this Court's assessment of claims one, two, three and four, or debate this Court's determination that Hendrick procedurally defaulted claims five, six and seven, and most of claim four, the Court declines to issue a certificate of appealability.  28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

**ACCORDINGLY, IT IS HEREBY ORDERED** that:

1.  The Clerk of Court shall note the substitution of Rick Whitten in place of the State of Oklahoma as party respondent.

2.  Hendrick's request for an evidentiary hearing is **denied**.

3.  The petition for writ of habeas corpus is **denied**.

4.  A certificate of appealability is **denied**.

5.  A separate judgment shall be entered in this matter.

**DATED** this 8th day of December 2021.

TERENCE C. KERN
United States District Judge